**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

SECURITIES AND EXCHANGE )
COMMISSION, )
          Plaintiff, )
  )
vs. )
  )
  )
MARTIN G. FRASER; DON W. )
WATSON; EDWARD W. O'BRIEN; )
GARY M. OPPER, )
  )
          Defendants. )
  )
_____ )

No. CV-09-00443-PHX-GMS

**ORDER**

      Pending before the Court are the Motions to Dismiss of Defendants Martin G. Fraser (Dkt. # 30) and Don W. Watson (Dkt. # 31). For the following reasons, the Court grants the motions in part and denies them in part.[1]

## BACKGROUND

      On March 5, 2009, the Securities and Exchange Commission ("SEC") instituted this action against Defendants Fraser, Watson, O'Brien, and Opper, all of whom were officers of CSK Auto Corporation ("CSK"). (Dkt. # 1.) According to the Complaint, Defendant

_____

[1]Defendants have requested oral argument on their motions. Those requests are denied because the parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

Fraser was CSK's president and chief operating officer ("COO") from 2000 to 2006. Defendant Watson was CSK's chief financial officer ("CFO"), senior vice president, and treasurer between 1998 and 2005, and from 2005 to 2006 he was CSK's chief administrative officer and senior vice president. Defendant O'Brien was a vice president and controller for CSK from 2003 to 2006, and Defendant Opper was CSK's director of credits and receivables from 2003 to 2006.

CSK itself was a nationwide retailer of automotive products. CSK's practice was to purchase the automotive products from various vendors, who would then pay CSK certain amounts, called "allowances," to market the products. CSK's largest vendor allowance program was called "Let's Work Together" ("LWT"). CSK accounted for LWT and other allowances by reducing on its books the cost of purchasing the products from vendors, thereby yielding greater reported pre-tax income. However, during 2002, 2003, and 2004, some of the vendor allowances recognized on CSK's books were not collectible (in that they could not legitimately be recognized on CSK's books to reduce the cost of products purchased). Generally Accepted Accounting Principles ("GAAP") required CSK to write off these uncollectible receivables, which would have increased CSK's expenses and thereby decreased its income. According to the SEC, however, CSK concocted a scheme to hide the uncollectible receivables from auditors in order to keep its income artificially inflated, which would result in an overstatement of CSK's financial performance on the annual reports filed with the SEC.

Under the alleged scheme, CSK concealed the uncollectible receivables by taking allowances collected under the LWT program for later program years and applying them to reduce an earlier program year's receivable. Specifically, CSK "made baseless journal entries reducing the account receivable for a prior LWT program year with an offsetting increase to the account receivable for a later LWT program year," and CSK also "applied LWT allowance collections for a later LWT program year to an earlier program year's LWT account receivable." (Dkt. # 14 at 7.) According to the SEC, "CSK also failed to write off LWT allowances it had over collected [sic] for prior LWT program years and ultimately paid

back to vendors," instead increasing "a later LWT program year's account receivable, making it appear that it had collected an older account receivable when all CSK had done was move the outstanding receivable balance to a more recent year." (*Id.*)

The SEC now contends that Defendants, CSK's senior officers, were responsible for the scheme to hide the uncollectible receivables. The SEC alleges that Defendants Fraser and Watson substantially participated in the preparation of CSK's 2002, 2003, and 2004 financial statements, while Defendants O'Brien and Opper substantially participated in the preparation of the 2003 and 2004 financial statements.

According to the SEC, Defendants Fraser and Watson were informed in 2001 by CSK's controller that the company was recognizing more LWT allowances than it was actually earning or likely to earn, and by 2002 Fraser and Watson knew of CSK's various efforts to hide the uncollectible receivables and that CSK's financial statements were incorrect. In 2002, Watson instructed CSK employees to raise additional allowances to compensate for amounts paid back to vendors for allowances recognized during prior years, and Fraser knew of Watson's instruction and CSK's failure to write off vendor allowances that were paid back. Also in 2002, Watson instructed a CSK employee to identify collections for the 2002 LWT program year to move to the 2001 year to cover for shortfalls in 2001. In all, CSK's pre-tax income was allegedly overstated by $11 million on its 2002 Form 10-K.[2]

Watson and Fraser allegedly knew of the misstatements on the Form 10-K. As CSK's chief financial officer, Watson signed the report and certified that it was true, that it fairly presented the financial condition of the company, and that he had disclosed to CSK's independent auditors and audit committee any management or employee fraud regarding the company's internal controls. Both Watson and Fraser were members of and participated in CSK's disclosure team meetings to review and discuss the Form 10-K. Both men also signed

[2]"The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." U.S. Sec. & Exch. Comm'n, *Form 10-K*, http://www.sec.gov/answers/form10k.htm (last visited July 29, 2009).

management representation letters to CSK's independent auditor confirming their responsibility for presenting financial statements fairly. Fraser signed sub-certifications in advance of the Form 10-K filing upon which others relied in making their own representations on SEC certifications. Fraser also signed due diligence certifications regarding the Form 10-K.

During 2003, CSK's use of the scheme allegedly escalated. Defendants "regularly received information regarding CSK's efforts to hide the uncollectible LWT allowances" during this time. (*Id.* at 10.) For instance, Defendant Opper emailed Fraser, Watson, and O'Brien on September 9, 2003, discussing the collection of 2002 LWT receivables. The email stated that "approximately $9.6mm [sic] in 2003 collections . . . were moved to 2002 to cover short falls [sic] from prior periods" and that the outstanding balance for the 2002 LWT program receivable did not include $5.4 million in 2002 paybacks. (*Id.*) This email included a chart containing the uncollectible allowances from prior years. On September 17, 2003, Defendants had a meeting regarding the "2002 outstanding LWT status." (*Id.* at 11.) Defendants also met on December 23, 2003, at which time they questioned CSK's independent auditor about recognizing 2004 allowances in 2003. Defendants then "had vendors sign agreements making it appear that CSK had earned additional LWT allowances during 2003, when, in fact, those allowances would be earned, if at all, based on purchases made during 2004." (*Id.*) The scheme allegedly resulted in an overstatement of CSK's pre-tax income by $34 million on the 2003 Form 10-K, making what would have been a pre-tax loss of $18 million appear to be a pre-tax gain of $16 million.

All Defendants are alleged to have been aware that the 2003 Form 10-K misstated CSK's financial situation. Watson and Fraser had involvement similar to their involvement with the 2002 Form 10-K. Defendant O'Brien, as CSK's controller, was responsible for the accuracy of CSK's financial statements. O'Brien was also a member of CSK's disclosure team and participated in its meetings, and as part of that process he reviewed and discussed the Form 10-K and the LWT allowances. O'Brien also signed sub-certifications and due diligence certifications akin to those signed by Fraser, and signed management representation

letters to CSK's independent auditor like those signed by Fraser and Watson. Defendant Opper is alleged to have used his position managing CSK's vendor accounts receivable department and the LWT program to cause employees to make the accounting entries necessary to hide the uncollectible receivables. For instance, Opper instructed a CSK employee to make a record-keeping entry on October 10, 2003, moving a 2002 LWT receivable to a 2003 receivable. Opper also kept track of CSK's movement of receivables and provided that information to Fraser, Watson, and O'Brien. Additionally, Opper provided CSK's independent auditor false documents and explanations, including in a memo written on November 24, 2003, to hide the fact that CSK could not collect on some of its vendor allowance receivables.

The scheme allegedly continued into 2004, and CSK's pre-tax income was overstated by $21 million on that year's Form 10-K. All Defendants were aware of the misstatement and had participation similar to their involvement with the 2003 Form 10-K. Between 2002 and 2004, Defendants Watson, O'Brien, and Opper allegedly circumvented CSK's internal controls by approving of or instructing others to make false journal entries. Defendant Fraser allegedly circumvented internal controls by ordering that a vendor agreement be split in two, with one agreement backdated, contrary to CSK policy.

CSK also filed a restatement of income with its 2004 Form 10-K. This restatement retroactively reduced CSK's vendor allowances between 2002 and 2004, claiming that the past overstatements were the result of "errors in estimation," "imprecise estimates," "bookkeeping errors," and "recording allowances in the incorrect periods." (*Id.* at 12.) However, according to the SEC, this restatement did not write off all uncollectible vendor allowance receivables, and Defendants continued to hide uncollectible receivables after that time. For instance, Defendants Watson, O'Brien, and Opper provided an incomplete list of vendor paybacks to CSK's independent auditor. Also, Fraser and Watson secured agreements with vendors by which the vendors agreed to pay additional LWT amounts in exchange for CSK's agreement to pay more for products. Then, Fraser allegedly "directed others to falsify documents to make it appear that CSK had entered into separate, seemingly

unrelated agreements, containing different dates," for the purpose of hiding from the auditor the fact that "CSK's receipt of additional LWT allowances was contingent upon CSK's willingness to grant price increases offsetting the LWT amounts the vendors purportedly agreed to pay." (*Id.* at 13.)

Moreover, $15 million in uncollectible allowances remained on CSK's books after the 2004 restatement. Defendants Watson, O'Brien, and Opper knew of this deficit by July 15, 2005. CSK then attempted to compensate for these uncollectible allowances by over-billing vendors, paying back the over-charges, and incorrectly accounting for the repayments. Specifically, on Opper's instructions, CSK issued debit memos in July of 2005 that included the uncollectible $15 million. Fraser, Watson, O'Brien, and Opper then met with other CSK employees, and Fraser stated that CSK "needed to make the debit memos 'stick.'" (*Id.* at 14.) Upon learning that many of the buyers saw errors in the debit memos, Fraser opined that "probably 70% of the debits would 'stick'" and "many of the vendors would not even notice them." (*Id.*) When vendors did complain, CSK negotiated deals offsetting future vendor allowances against the debit memos. Defendant O'Brien would create and issue credit memos to the vendors describing the paybacks as being related to "costing," "pricing increases – steel surcharge," or "warranty," and CSK would falsify its books and records to conceal the fact that it was paying back portions of the debit memos. (*Id.*) Defendant Opper allegedly approved the misapplication of paybacks to vendors and the misapplication of those paybacks to later LWT receivables.

While the allegedly false financial information was outstanding, CSK engaged in several private debt offerings. CSK's prior statements on the Forms 10-K were incorporated into the Form S-3 and Form S-4 registration statements relevant to those offerings. In connection with one of the offerings, Defendants Fraser, Watson, and O'Brien signed a management representation letter to CSK's independent auditor confirming prior representations about CSK receivables that they knew were false.

Lastly, Defendants Fraser and Watson received bonuses in 2002 and 2003 based in part on CSK's inflated financial performance. Defendants O'Brien and Opper also received

bonuses in 2003 based in part on CSK's financial performance. The SEC does not allege the amount of the bonuses received by any of Defendants, but the SEC does allege that Defendants Fraser, Watson, and Opper sold CSK stock during the period of the alleged fraud, making $195,419, $155,122, and $28,078.20, respectively.

The SEC's First Amended Complaint asserts numerous violations of the securities laws as a result of Defendants' actions. Specifically, the Complaint seeks relief on eight claims:

(1) committing fraud in the offer or sale of securities, violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a);

(2) committing fraud in connection with the purchase or sale of securities, violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5;

(3) aiding and abetting CSK's violations of the SEC's periodic reporting requirements under Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), Rule 12b-20, 17 C.F.R. § 240.12b-20, and Rule 13a-1, 17 C.F.R. § 240.13a-1, in violation of 15 U.S.C. § 78t(e);

(4) aiding and abetting CSK's violations of record-keeping requirements under Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), in violation of 15 U.S.C. § 78t(e) and Rule 13b2-1, 17 C.F.R. § 240.13b2-1;

(5) aiding and abetting CSK's internal controls violations under Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), in violation of 15 U.S.C. § 78t(e);

(6) circumventing internal controls and falsifying records, in violation of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5);

(7) making false statements to accountants, in violation of Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2; and

(8) failing to comply with certification requirements, in violation of Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.

(*Id.* at 23-29.) Claims one through six are asserted against all Defendants, claim seven against Defendants Fraser, Watson, and O'Brien only, and claim eight against Defendant Watson only. (*Id.*)

Defendants Fraser and Watson now bring motions to dismiss the First Amended Complaint, arguing under Federal Rule of Civil Procedure 12(b)(6) that the Complaint fails to state a claim against them upon which relief can be granted, and arguing under Federal Rule of Civil Procedure 9(b) that the Complaint fails to plead claims with the requisite particularity. (Dkt. ## 30, 31.)

## DISCUSSION

## I.  Legal Standards

### A.  Rule 12(b)(6)

To survive a dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise the right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004)). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal citations omitted).

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). In addition, the Court must assume that all general allegations "embrace whatever specific facts might be necessary to support them." *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994). Although "a complaint need not contain detailed factual allegations," *Clemens*, 534 F.3d at 1022, the Court will not assume that the plaintiff can prove facts different from those alleged in the complaint, *see Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005). Similarly, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

## B. Rule 9(b)

If a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud." This requires that the party alleging fraud include an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (citation and ellipsis omitted). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal

quotations omitted).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

## II.  Analysis

Defendants Fraser and Watson make similar arguments in generally the same order: (1) that the Section 17(a), Section 10(b), and Rule 10b-5 claims must be dismissed; (2) that the Section 13 claims must be dismissed; and (3) that the statute of limitations bars the imposition of civil penalties based on events prior to March 5, 2004.  Rather than discuss the two motions to dismiss sequentially, the Court will address each Defendant's arguments relevant to these three issues.

### A.  Section 17(a), Section 10(b), and Rule 10b-5 Claims

Defendant Fraser argues that because none of the SEC's allegations are sufficient to establish substantial participation, and because the SEC may not advance a scheme theory of liability, the Court must dismiss the claims against them for primary violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.  (Dkt. # 30 at 8-13.)  Section 17(a) provides that it is "unlawful for any person in the offer or sale of any securities[,] . . . directly or indirectly," to (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made . . . not misleading"; or (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a).  Section 10(b) provides that it is unlawful "for any person, directly or indirectly" to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  One such regulation is Rule 10b-5, which essentially restates the language of Section 17(a).  *See* 17 C.F.R. § 240.10b-5.  "These antifraud provisions forbid making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce."  *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001).  "The elements of liability for violations of Section 17(a)(1) of the Securities Act,

Section 10(b) of the Exchange Act and Rule 10b-5 . . . are the following: (1) a misrepresentation or omission (where a duty to speak exists); (2) of material fact; (3) made with scienter; and (4) made in connection with the sale or purchase of securities." *SEC v. Leslie*, No. C 07-3444, 2008 WL 3876169, at *5 (N.D. Cal. Aug. 19, 2008) (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).

"Substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability [under these sections] even though that participation might not lead to the actor's actual making of the statements." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000). Where a defendant plays "a significant role in drafting and editing" a public statement and that statement is "prepared after extensive review and discussions" with the defendant, then the defendant may be held liable as a primary violator. *See In re Software Toolworks, Inc.*, 50 F.3d 615, 628 n.3 (9th Cir. 1994).

Here, the First Amended Complaint alleges that Fraser was a member of CSK's disclosure team meetings and that he attended and participated in those meetings, reviewing and discussing CSK's Forms 10-K for 2002, 2003, and 2004. (Dkt. # 14 at 17.) The Complaint further alleges that Fraser reviewed and discussed the accounting and disclosure issues related to those forms, including the "collectibility of LWT allowances." (*Id.*) Fraser then signed sub-certifications, due diligence certifications, and management representation letters which provided that the forms were accurate and fairly represented CSK's financial condition. (*Id.* at 17-18.) In sum, the Complaint alleges that Fraser had some involvement in the creation of the Forms 10-K and thereafter certified in various documents that the forms were accurate.

These allegations are not sufficient to state a claim for substantial participation. The First Amended Complaint contains no allegation that Fraser had any role in the actual drafting or editing of the Forms 10-K, much less the "*significant* role in drafting and editing" that is required under *Software Toolworks*. *See* 50 F.3d at 628 n.3 (emphasis added). Moreover, while the Complaint does allege that Fraser had some level of involvement in

reviewing and discussing the Forms 10-K, there are no allegations of the nature of those reviews and discussions, that Fraser suggested what the forms should state, or that any such suggestion, if it occurred, was heeded. Rather, the SEC offers only the vague assertion that Fraser was somehow involved in reviews and discussions. This falls short of alleging the "*extensive* review and discussions" required by *Software Toolworks*. *See id.* (emphasis added); *In re Seracare Life Scis., Inc.*, No. 05-CV-2335-H, 2007 WL 935583, at *10 (S.D. Cal. Mar. 19, 2007) (finding that allegations that an outside auditor evaluated forms and participated in editing and approving them "falls significantly short of the type of participation that the Ninth Circuit found sufficed to establish liability under a substantial participation theory in *Software Toolworks*"); *cf. Commc'ns Workers of Am. Plan v. CSK Auto Corp.*, No. CV06-1580, 2007 WL 951968, at *3 (D. Ariz. Mar. 28, 2007) (dismissing a complaint against Fraser alleging that he substantially participated in making misrepresentations about CSK's financial status on conference calls because "the Complaint does not explain Fraser's involvement or participation in any of the phone calls").[3] The Complaint's assertions also fall short of alleging fraud consistent with the heightened pleading standards of Rule 9(b). *See Leslie*, 2008 WL 3876169, at *5 ("Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent representation, how or why the representation was false or misleading and, in some cases, the identity of the person engaged in the fraud.") (quoting *In re Metricom Sec. Litig.*, No. C 01-4085, 2004 WL 966291, at *8 (N.D. Cal. Apr. 29, 2004)). The absence of specific facts regarding the nature of Fraser's involvement in these meetings, beyond the mere assertion that he was present and somehow involved, is not sufficient to properly state a claim in these circumstances.

Nor is the mere fact that Fraser signed statements certifying that, to the best of his knowledge, the forms were correct sufficient to establish that he substantially participated in making the financial statements themselves. *See SEC v. Todd*, No. 03CV2230BEN, 2006

[3]*Communications Workers of America*, case number CV06-1580, involved similar allegations of securities fraud brought against Defendants CSK, Fraser, and Watson (among others) by private plaintiffs. The case was eventually settled.

- 12 -

WL 1564892, at *10-11 (S.D. Cal. May 30, 2006) (finding that a corporate officer's signing of a management representation letter to an outside auditor that falsely represented that financial statements were consistent with required accounting procedures was not, without more, sufficient to establish liability); *cf. Commc'ns Workers*, 2007 WL 951968, at *3 ("Vague and repetitive allegations that defendants reiterated the financial results [of CSK] are not sufficient to show that Fraser substantially participated or was intricately involved in any of the other Defendants' purported misrepresentations.") (internal citations, quotations, and ellipsis omitted). The First Amended Complaint therefore fails to state a claim against Fraser for substantial participation.[4]

The SEC alternatively argues that, instead of proving a material misstatement or omission, it may prove a scheme or artifice to defraud or a fraudulent act, practice, or course of conduct. (Dkt. # 48 at 4-7.) Scheme liability is derived from the first and third prongs in Section 17(a) and Rule 10b-5. *See* SEC v. Fitzgerald, 135 F. Supp. 2d 992, 1028-29 (N.D. Cal. 2001) ("[T]o establish a violation of the securities laws, the SEC must prove *at least one* of the following three propositions: (1) that the defendants employed a device, scheme, or artifice to defraud . . . ; (2) that the defendants made an untrue statement of material fact or omitted a material fact . . . ; and (3) that the defendants engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit . . . .") (emphasis added).

The Ninth Circuit explicitly sanctioned scheme liability in *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006). In *Simpson*, the Ninth Circuit held, in the context of a private enforcement action, that deceptive conduct in furtherance of a scheme to defraud was a primary violation of the securities laws under Section 10(b). *Id.* at 1043. Specifically, the court held that "to be liable as a primary violator of § 10(b) for participation

---

[4]The SEC also argues that the First Amended Complaint adequately states a claim based on *SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008). (Dkt. # 48 at 7-9.) The *Tambone* opinion, however, has recently been withdrawn and vacated for rehearing en banc. *SEC v. Tambone*, --- F.3d ---, 2009 WL 2170692 (1st Cir. July 22, 2009). The Court therefore will not consider arguments predicated upon *Tambone*, although the SEC remains free to reassert this theory in subsequent pleadings and motions based on independent authority.

in a 'scheme to defraud,' the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme," clarifying that "the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Id.* at 1048 (emphasis omitted). The Ninth Circuit based this conclusion in part on the Supreme Court's reasoning that Section 10(b) "'should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Id.* at 1049 (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)). In a separate section on the reliance requirement for private enforcement cases, the *Simpson* court concluded that "a plaintiff may be presumed to have relied on this scheme to defraud if a misrepresentation, which necessarily resulted from the scheme and the defendant's conduct therein, was disseminated into an efficient market and was reflected in the market price." *Id.* at 1052.

*Simpson*, however, was vacated and remanded in light of *Stoneridge Investment Partners LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008). *See Simpson v. Homestore.com, Inc.*, 519 F.3d 1041, 1041-42 (9th Cir. 2008) (vacating the court's prior order in light of *Stoneridge*). In *Stoneridge*, the Supreme Court held that the private right of action in Section 10(b) did not extend to certain customer/supplier companies alleged to have cooperated with a cable company's scheme to misrepresent its financial situation because none of the investor plaintiffs relied on the customer/supplier companies' statements or representations. 128 S. Ct. at 766. The Supreme Court was clear that it disputed the principles of *Simpson* only insofar as they were inconsistent with the requirement that a private plaintiff must rely on the defendant's deceptive conduct for Section 10(b) liability to attach. *See id.* ("We conclude the implied right of action does not reach the customer/supplier companies *because the investors did not rely upon their statements or representations*.") (emphasis added); *id.* at 770 ("Invoking what some courts call 'scheme liability,' petitioner nonetheless seeks to impose liability on respondents even absent a public statement. *In our view this approach does not answer the objection that petitioner did not in fact rely upon respondents' own deceptive conduct*.") (emphasis added and internal

citations omitted). Although reliance is an element of a private right of action under Section 10(b), *id.* at 769, reliance is not an element for purposes of Section 10(b) enforcement actions brought by the SEC, *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993). Therefore, where reliance is not an element of the claim, scheme liability remains a viable theory under which the SEC may bring civil claims.

Defendant Fraser objects to this reading of *Stoneridge*, arguing that the Supreme Court "expressed its intent that participants in 'schemes' to make false public statements – but who themselves are not speakers – be subject to aiding and abetting claims," rather than primary liability. (Dkt. # 51 at 3.) The language in *Stoneridge* to which Fraser cites, however, merely evinces the Supreme Court's concern that public and private rights of action not be conflated, as only the SEC can assert aiding and abetting liability. *See Stoneridge*, 128 S. Ct. at 771 ("Petitioner's view of primary liability makes any aider and abettor liable under § 10(b) if he or she committed a deceptive act in the process of providing assistance. Were we to adopt this construction of § 10(b), it would revive in substance the implied cause of action against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud; and we would undermine Congress' determination that this class of defendants should be pursued by the SEC and not by private litigants."). Indeed, *Stoneridge* elsewhere agreed that "if business operations are used, as alleged here, to affect securities markets, the SEC enforcement power may reach the culpable actors." *Id.* at 770.

Moreover, the Supreme Court itself has held, in the context of an SEC action, that a non-speaking actor who engaged in a "scheme to defraud" has used or employed a deceptive device within the meaning of Section 10(b). *See Zandford*, 535 U.S. at 821-22 (finding that an SEC complaint alleging that a securities broker "engaged in a scheme to defraud" by misappropriating a client's securities stated a viable claim and should not have been dismissed, even though the broker made no affirmative misrepresentations). Subsequent courts have recognized that scheme liability survives *Stoneridge*. *See, e.g.*, *New York City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 995-98 (N.D. Cal. 2009) (distinguishing *Stoneridge* and holding that a complaint stated a proper claim for scheme liability); *In re*

- 15 -

*Micron Tech., Inc., Sec. Litig.*, No. CV-06-85-S-BLW, 2009 WL 453917, at *2-4 (D. Idaho Feb. 23, 2009) (explaining how *Stoneridge* does not undermine all scheme liability); *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1125-26 (C.D. Cal. 2008) (finding a complaint's allegations insufficiently pled but explaining how scheme liability functions after *Stoneridge* and *Simpson* in the context of a private right of action). Thus, Fraser's argument that the SEC may not pursue a scheme theory of primary liability is unavailing.[5]

However, the SEC has not alleged sufficient facts to plead scheme liability against Fraser. To be liable for a scheme to defraud, a defendant must have "committed a manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). To commit a manipulative or deceptive act, the defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson*, 452 F.3d at 1048. "It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Id.* "For example, masterminding a misleading accounting scheme can suffice as conduct that furthers a fraudulent scheme." *SEC v. Berry*, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008). While the defendant need not actually make a fraudulent statement, *see Simpson*, 452 F.3d at 1048, "a plaintiff nevertheless must show more than a generalized scheme of misconduct," *In re Brocade Commc'ns Sys., Inc.*

---

[5]The Court is aware that, in an unpublished case, the Ninth Circuit stated that "*until recently*, a defendant could be liable in this circuit as a primary violator of § 10(b) for participating in a scheme to defraud if 'the defendant . . . engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.'" *Loran Group v. Peregrine Sys.*, 310 F. App'x 149, 151 n.3 (9th Cir. 2009) (emphasis added) (quoting *Simpson*, 452 F.3d at 1048). The Ninth Circuit made that comment, however, in the context of a securities case brought by private plaintiffs who could not establish the reliance requirement. *Id.* at 151-52. Thus, this statement does not establish that the Ninth Circuit views scheme liability to have been abrogated in the context of claims brought by the SEC, in which reliance is not an element of the claim.

*Derivative Litig.*, 615 F. Supp. 2d 1018, 1044 (N.D. Cal. 2009) (citing *Stoneridge*, 128 S. Ct. at 769).

Here, while the SEC has alleged a generalized scheme of misconduct, it has not pled sufficient facts to establish that Fraser's *own conduct* had a deceptive purpose and effect. This case is analogous to *Brocade Communications*, in which the court dismissed Section 10(b) claims brought against an officer alleged to have been aware of and involved in the granting of faulted stock options. *Id.* at 1044-45. The complaint alleged that the officer was in charge of the company's finance department, failed to investigate indications that option grants were being manipulated, was involved in the granting of options, and approved the backdating of some options. *Id.* "While these allegations may show that [the officer] was complicit in the backdating scheme," the court held that "[n]one of these factual assertions has the effect of demonstrating that [the officer] was a 'primary violator' of the securities laws" because "[i]t is not clear what specific misrepresentations [the officer] is allegedly responsible for, or that his own conduct had a deceptive purpose." *Id.* at 1045.

In the same way, the SEC allegations are not particular enough to plead more than Fraser's acquiescence in a scheme to hide vendor allowances. While the transactions themselves are clearly alleged to be deceptive, the SEC has not pled what aspects of Fraser's conduct had a deceptive purpose and effect in furtherance of the scheme. Fraser is not alleged to have masterminded the scheme and the SEC suggests that he effected the scheme principally by attending meetings and signing certifications.[6] But there is no allegation or

---

[6]It is not clear whether the SEC means to include any of Fraser's other conduct described in the First Amended Complaint as part of this allegation, for counts one and two, which contain the Section 17(a), Section 10(b), and Rule 10b-5 claims, simply refer to "the conduct described above" in the facts section. (Dkt. # 14 at 24.) Regardless, the other references to Fraser's conduct in the Complaint are not sufficiently pled under Rule 9(b) to support a claim for securities fraud in claims one and two. For instance, the SEC alleges that Fraser "directed others to falsify documents" in connection with vendor agreements after the 2004 restatement to hide the consequences of the scheme (Dkt. # 14 at 13), but the nature of these documents, the identity of the employees, and interactions with vendors, and any description of when and how this occurred, is absent. Fraser is also alleged to have tried to

- 17 -

facts supporting the notion that the "principal purpose and effect" of any such actions was to create "a false appearance of fact in furtherance of the scheme," *Simpson*, 452 F.3d at 1048, and *Brocade Communications* contained significantly more detailed allegations than those present here, yet those assertions were nevertheless found insufficient to properly plead scheme liability, *see* 615 F. Supp. 2d at 1044-45. Given the heightened pleading requirements of Rule 9(b), *see Leslie*, 2008 WL 3876169, at *5; *Metricom Sec. Litig.*, 2004 WL 966291, at *8, the SEC has failed to state a claim for scheme liability against Fraser.[7]

---

cover up the allowance scheme by telling a "group" including Defendants and "other CSK employees" that CSK "needed to make [improperly-issued] debit memos 'stick'" (*id.* at 14), but who these employees were, when the meeting happened, and other specifics are not provided. Fraser is further alleged to have "directed that a vendor agreement relating to LWT allowances be split into two, with one agreement backdated." (*Id.* at 22.) However, the SEC does not allege when this happened, who was directed to take this action, the identity of the vendor, or any other specific facts regarding this allegation. None of these statements in the Complaint provide sufficiently detailed factual allegations regarding the "who, what, when, where, and how" of the allegedly fraudulent conduct to support an inference of liability on claims one and two. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.") (quoting *Cooper*, 137 F.3d at 627); *Edwards*, 356 F.3d at 1066 (explaining that a party alleging fraud must include an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation").

[7]In a brief paragraph, the SEC also states that because Fraser was the President and COO of CSK, attended disclosure team meetings, and signed certifications, his mere silence when the Forms 10-K were issued is sufficient to establish his participation in the scheme to defraud. (Dkt. # 48 at 6.) The SEC cites only to *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) (involving the making of a "no comment" statement during merger discussions); *Tambone*, 550 F.3d at 132 (involving underwriters' use of prospectuses), *vacated for rehearing en banc by* 2009 WL 2170692; and *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 177 (2d Cir. 1998) (involving an accounting firm's discovery of errors in previous financial statements). The SEC offers no analysis of these cases and does not explain why they are analogous to the facts presented here. The Court is not aware of any cases imposing scheme liability on a defendant like Fraser in circumstances similar to those present here, nor will the Court affirm the viability of the SEC's theory without proper briefing on the subject. Therefore, the Court will not consider the SEC's argument in this regard in ruling on Fraser's motion to dismiss. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003) (pointing out that "[o]ur circuit has repeatedly admonished that we cannot

Fraser's arguments about the general deficiencies of the First Amended Complaint are also well-taken. When pleading irregularities in revenue recognition, the SEC should allege: "(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or company employees involved in the transactions." *Seracare*, 2007 WL 935583, at *6 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005)). "A plaintiff does not necessarily need to allege each of these details, but they must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.* Here, the First Amended Complaint identifies no vendors, no products, no specific transactions, no names for the CSK employees Defendants allegedly directed to act improperly, and few specific dates, and it contains only the broadest allegation of the amount by which income was allegedly overstated. While the SEC need not plead in exhaustive detail all facts it expects to prove at trial, it must plead more than what it has provided here.

The SEC has not properly stated a claim against Fraser for primary liability in the First Amended Complaint. Because it is not clear that amendment would be futile, the Section 17(a), Section 10(b), and Rule 10b-5 claims are dismissed with leave to amend. *See Leslie*, 2008 WL 3876169, at *4 ("Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment.").

Defendant Watson's principal argument in this section is that the SEC must make a heightened pleading of scienter, with facts establishing a strong inference thereof. (Dkt. # 31 at 4, 8-12.) Fraser makes a similar argument, although it is much more brief. (Dkt. # 30 at 12-13.) Defendants, however, rely on cases from other circuits and cases brought by private plaintiffs in making that argument. The Ninth Circuit has squarely held that the

manufacture arguments [for a party]," that "we review only issues which are argued specifically and distinctly," and that "[w]e require contentions to be accompanied by reasons").

- 19 -

general pleading of scienter is permissible in cases initiated by the SEC and not brought under the Private Securities Litigation Reform Act. *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) ("[P]laintiffs need simply say that scienter existed to satisfy the requirements of Rule 9(b).") (internal quotations, ellipsis, and brackets omitted); *SEC v. Small Cap Research Group, Inc.*, 226 F. App'x 656, 657 (9th Cir. 2007) (explaining that because the action was brought by the SEC, allegations of scienter may be averred generally); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Thus, the SEC need not make a heightened pleading of scienter under the liberal standard employed by the Ninth Circuit. *See Leslie*, 2008 WL 3876169, at *6 (distinguishing cases from other circuits and explaining that "the Ninth Circuit has adopted a rather lenient scienter standard in cases brought by the SEC").

Watson's arguments that a heightened pleading of scienter is required under *Iqbal* are not persuasive. *Iqbal* stated that, in the context of pleading allegations of discriminatory intent "generally" under Rule 9(b), "'generally' is a relative term" and "it is to be compared to the particularity requirement applicable to fraud or mistake." 129 S. Ct. at 1954. Although the Supreme Court held that Rule 9(b) "does not give [a plaintiff] license to evade the less rigid – though still operative – strictures of Rule 8," the Court was equally clear that Rule 9 "excuses a party from pleading discriminatory intent under an elevated pleading standard." *Id.* Thus, while the Ninth Circuit's statement that "plaintiffs need simply say that scienter existed to satisfy the requirements of Rule 9(b)," *Fecht*, 70 F.3d at 1082 (internal quotations, ellipsis, and brackets omitted), is not fully descriptive of the pleading requirements in light of *Iqbal* – a plaintiff, of course, must still provide a sufficient factual context to render a finding of scienter plausible – it nevertheless remains the law in this circuit that the SEC need not make a heightened pleading of scienter. The Complaint's pleading of scienter is therefore sufficient.[8]

_____

[8]Watson's arguments about the deficiencies of the First Amended Complaint's pleading of scienter presuppose the conclusion that a heightened pleading is required, and

## B.     Section 13 Claims

In challenging the Section 13 claims, Defendants Fraser and Watson first contend that those claims "sound in fraud" and are therefore subject to the strictures of Rule 9(b).  *See Daou Sys.*, 411 F.3d at 1027 ("The plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).") (quoting *Vess*, 317 F.3d at 1103-04).  The SEC does not adequately dispute this argument,[9] and therefore all of the Section 13 claims will be held to Rule 9(b)'s heightened pleading standard.

---

thus the Court need not discuss the specific allegations in the Complaint.  Regardless, the Complaint states in many places that Defendants had the requisite levels of scienter and it provides a sufficient factual context regarding the nature of Defendants' actions rendering those allegations plausible.  *See Leslie*, 2008 WL 3876169, at *6 (finding an adequate pleading of scienter where the SEC alleged that corporate officers knowingly failed to inform auditors of the true nature of certain contracts and that the officers were aware of how the contracts should have been treated, yet continued to act in accordance with the alleged scheme; were informed of the details of the underlying transactions; or knowingly implemented practices that led to the improper accounting).

[9]In responding to Defendant Watson's motion, the SEC states that "to the extent" fraud is not an element of any of its claims, the Court should consider only whether the SEC has stated a claim pursuant to Rule 8(a).  (Dkt. # 49 at 8.)  The Court does not interpret that statement as an objection to treating any specific claim as grounded in fraud.  The only specific claims that the SEC disputes are grounded in fraud are the allegations that Watson aided and abetted record-keeping violations by instructing a CSK employee to falsify books and records to cover shortfalls in accounts receivable, and aiding and abetting internal controls violations by instructing employees to falsify CSK's books and records.  (Dkt. # 49 at 13-14.)  The SEC offers no authority to support these assertions, and the Complaint's allegations on these points seem plainly grounded in fraud given that Watson was engaged in a "unified course of fraudulent conduct" upon which the SEC "rel[ies] entirely . . . as the basis of a claim."  *Daou Sys.*, 411 F.3d at 1027.  The SEC also fails to explain how the Complaint states a claim were the Court to discard the averments of fraud, as would be the proper analysis.  *See id.*  Thus, the Court will hold these allegations to the standards of Rule 9(b).

Defendants Fraser and Watson contend that the Section 13 claims applicable to them[10] are not pled with the requisite particularity under Rule 9(b). (Dkt. # 30 at 14-17; Dkt. # 31 at 13-17.) As a general matter, the Court agrees with Fraser that the SEC's overall method of pleading these claims is inappropriate in this context. In the First Amended Complaint, the SEC first sets forth a lengthy narrative facts section, next incorporates the facts section into each claim by reference, and then simply states that "defendants" violated various provisions of the securities laws "by engaging in the conduct alleged above." (*See* Dkt. # 14.) This leaves the Court with the task of untangling which (if any) act(s) engaged in by which (if any) defendant(s) applies to which (if any) claim(s). District courts have commented upon the unhelpfulness of this pleading strategy in this context and have dismissed SEC complaints because of it. *See, e.g.*, *SEC v. Mercury Interactive*, No. C07-2822JF, 2008 WL 4544443, at *8 (N.D. Cal. Sept. 30, 2008) (explaining that this pleading style made it "difficult to discern which filings form the bases for each claim" and noting that "because [the defendant, a corporate officer,] is not alleged to have signed any of the [allegedly-fraudulent] filings, but rather to have assisted in their drafting and preparation, specificity regarding her conduct is particularly important"); *SEC v. Patel*, No. 07-CV-39-SM, 2009 WL 2015794, at *1-2 (D.N.H. July 7, 2009) (criticizing this pleading style because "to reasonably determine that any particular claim should not be dismissed would require the court to first comb the complaint in search of factual support for each element of the multiple claims pled as to each defendant, and then evaluate the adequacy of that factual support," which "is, of course, plaintiff's job in the first instance, not the court's").

In one case, the court responded to the repleading of a complaint in this manner by scheduling a hearing at which the SEC's attorneys would have to, "on the record, efficiently and effectively review its claims . . . defendant by defendant, and distinct legal theory by

---

[10]Claims three though seven are applicable to both Fraser and Watson, while claim eight is applicable only to Watson. (Dkt. # 14 at 26-30.)

distinct legal theory, pointing out, element by element, the specific factual allegations pled in the [complaint] that support each claim." *Patel*, 2009 WL 2015794, at *2.

In the same vein, Defendant Watson argues that the First Amended Complaint engages in "shotgun" and "puzzle" pleading. (Dkt. # 31 at 6-8.) "Shotgun pleadings" are pleadings that "incorporate every antecedent allegation by reference to each subsequent claim for relief or affirmative defense." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group., Inc.*, --- F. Supp. 2d ---, 2009 WL 890479, at *16 (D. Ariz. 2009) (citation omitted). "Puzzle pleadings" are pleadings that "require the defendant and the court to match the statements up with the reasons they are false or misleading." *Id.* (citation omitted). "A complaint which relies on shotgun or puzzle pleading *does not meet Rule 9(b)'s particularity requirement*." *Id.* (emphasis added and internal quotations omitted) (citing *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007)). The SEC does not directly respond to this argument, other than to baldly state that it is "baseless." (Dkt. # 49 at 9.)

While the SEC's First Amended Complaint does not embody the worst-case-scenario of shotgun or puzzle pleading (in that the Complaint does not span hundreds of pages or make dozens of claims), the Complaint nonetheless makes use of those practices, resulting in an improper pleading format for a complex securities action such as this one. The Complaint incorporates every factual paragraph into each claim section, and it makes no attempt to lay out which conduct constitutes the violations alleged. Rather, the claims sections simply paraphrase or quote the language of the statutes and rules, leaving Defendants (and the Court) with the task of combing the Complaint and inferring, rightly or wrongly, what specific conduct the SEC intended to assert as a violation. Given the multiple defendants at issue in each claim, the lack of clarity about which actions apply to each claim, and the general vagueness of the factual allegations, the Complaint does not satisfy Rule 9(b)

under the principles of *Teamsters Local 617*, 2009 WL 890479, at \*16, *Mercury Interactive*, 2008 WL 4544443, at \*8, and *Patel*, 2009 WL 2015794, at \*1-2.[11]

Moreover, the SEC's specific pleading of the Section 13 claims does not meet the requirements of Rule 9(b). Claims three through five allege that Fraser and Watson aided and abetted CSK's violations of the SEC's periodic reporting requirements, record-keeping requirements, and CSK's own internal controls by knowingly providing substantial assistance to CSK. (Dkt. # 14 at 26-28.) It is unclear which of Fraser's and Watson's alleged actions form the basis of these claims. It seems that the signing of documents played a part in this provision of substantial assistance, but the First Amended Complaint does not specify if that is the extent of the alleged violations. As described above, the mere allegation that Defendants participated in a fraudulent scheme is not a sufficiently-pled allegation to satisfy Rule 9(b) in the absence of a specific pleading of the "who, what, when, where, and how" of the allegedly fraudulent conduct. *See Vess*, 317 F.3d at 1106. Such specifics are not provided in the Complaint, and thus these claims do not satisfy Rule 9(b).

Claim six, which alleges that Fraser circumvented internal controls and falsified records, also fails the Rule 9(b) test. On this point, the First Amended Complaint states only that Fraser "directed that a vendor agreement relating to LWT allowances be split into two, with one agreement backdated," apparently in violation of "various policies" that CSK had developed regarding vendor allowances. (Dkt. # 14 at 22.) However, when this allegedly happened, where it happened, how Fraser directed it, who was directed, which vendor agreement (and which vendor) were involved, and other specific facts – including the specifics of the policy Fraser ostensibly violated – are not provided. This does not meet the pleading requirements of Rule 9(b). Claim six also alleges that Watson circumvented internal controls and falsified records. The SEC argues that this claim "overlaps with the Fourth and Fifth Claims" against Watson (Dkt. # 49 at 15), but the Complaint provides that

---

[11]Although presented in the discussion of the Section 13 claims, Defendant Watson is clear that his argument in this regard applies to all of the SEC's claims against him. (Dkt. # 31 at 8.)

Watson circumvented CSK's internal controls by, "among other things, instructing or approving the entry of false journal entries," (Dkt. # 14 at 22). When he did so, what journals contained false entries, whether he was instructing "or" approving those entries, who was instructed or had their work approved, and what the "other things" Watson may have done are all unspecified. This likewise fails the requirements of Rule 9(b).

So too does claim seven, alleging that Fraser and Watson made false statements to accountants, fall short of the Rule 9(b) pleading standard. It is unclear to what conduct this claim refers, and the specifics of the conduct and the theory by which that conduct violated the securities laws are not clear. The SEC suggests that this claim is adequately alleged though the allegation that Fraser and Watson signed management representation letters to CSK's auditors (Dkt. # 48 at 16; Dkt. # 49 at 8-9), but the First Amended Complaint also asserts that "Defendants regularly lied to CSK's independent auditor in connection with its reviews and audits of CSK's financial statements" (Dkt. # 14 at 21). Which defendants made what lies, when specific lies were told, how statements were false, what reviews and audits were implicated, and other pertinent facts are not provided. Such a broad and undifferentiated allegation, lumping all defendants together and asserting a long pattern of general misconduct, is insufficient to satisfy Rule 9(b). *See, e.g.*, *Patel*, 2009 WL 2015794, at *1 (finding an SEC complaint deficient where "[a]ll but one of the claims is directed against 'the Defendants' collectively, and none of them states particularized theories of liability against specific defendants"); *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1292-93 (S.D.N.Y. 1996) ("[T]he complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.") (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995)).

Finally, claim eight, which alleges that Watson failed to comply with certification requirements, also fails to satisfy Rule 9(b). This claim is ostensibly based on Watson's signing of certifications included with the Forms 10-K in 2002, 2003, and 2004 – but the

First Amended Complaint states that he violated the rule by, "among other things," certifying that the forms fully complied with the requirements of the Exchange Act. (Dkt. # 14 at 29.) What these "other things" are is left undefined. The Complaint also alleges in this claim that "the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading" (*id.* at 29-30), but the specifics of the untrue statements and omitted material are not provided. Presumably this claim relies on the allegation that Watson falsely certified that he had no knowledge of any untrue statement in the report, that the report fairly presented the financial condition of CSK, and that Watson had disclosed any fraud (*see id.* at 16), but these allegations are simply too nebulous to specifically plead what should or should not have been in the reports. To hold otherwise would permit the SEC to simply plead that reports did not include required material, without specifying what that material actually was, and thereupon to validly plead a claim for certification violations. That would, as this claim does, fail to meet the heightened pleading standards of Rule 9(b).

In sum, the SEC has failed to adequately plead its Section 13 claims. Those claims are therefore dismissed with leave to amend.

## C.    Statute of Limitations and Civil Penalties

Defendants Fraser and Watson also point out that the statute of limitations bars the imposition of civil penalties based on claims accruing more than five years before this case was filed. Fraser argues that the Court should therefore dismiss any request for civil penalties based on events that occurred prior to March 5, 2004. (Dkt. # 30 at 17.) The SEC does seek civil penalties (Dkt. # 14 at 32), and actions for civil penalties "shall not be entertained unless commenced within five years from the date when the claim first accrued," 28 U.S.C. § 2462. Because this action was filed on March 5, 2009 (Dkt. # 1), the SEC is thus

unable to pursue civil penalties for claims against Fraser that accrued prior to March 5, 2004.[12]

The SEC argues in response that "the statute of limitations period may be equitably tolled under the fraudulent concealment doctrine," and it suggests that the doctrine is applicable here. (Dkt. # 48 at 16-17 n.10.) However, fraudulent concealment must be "affirmatively pleaded and proved" to toll the statute of limitations. *Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (quoting *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 662-63 (9th Cir. 1999)). Moreover, fraudulent concealment must be pled with particularity. *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006). Here, the SEC has not even pled the doctrine of fraudulent concealment in the First Amended Complaint, much less has it done so with particularity. The SEC has also failed to allege any facts regarding the third element of fraudulent concealment: that the SEC acted with due diligence until discovering the fraudulent concealment. *See Fed. Election Comm'n v. Williams*, 104 F.3d 237, 241 (9th Cir. 1996) (holding that under the doctrine of fraudulent concealment a plaintiff must establish "due diligence by the plaintiff until discovery" of the concealment of operative facts). Because the SEC has not properly pled equitable tolling under the doctrine of fraudulent concealment, that doctrine does not prevent the Court's dismissal of claims against Fraser accruing before March 5, 2004.

Defendant Watson makes an argument similar to Fraser on this point (Dkt. # 31 at 17), but the SEC points out that he signed an agreement with the SEC tolling the running of the statute of limitations between February 22, 2008, and December 31, 2008 (Dkt. # 49 at 15-16; Dkt. # 50 Ex. A). The SEC provides the agreement and requests that the Court take

---

[12]Defendant Fraser refers to "events occurring before March 5, 2004" (Dkt. # 30 at 17), and the SEC responds by asserting that "the bulk of the alleged wrongful conduct occurred within the limitations period" (Dkt. # 48 at 16), but the parties do not argue over any specific conduct or when any specific claim accrued. Therefore, the Court's ruling is no broader than the scope of the arguments made to the Court: the SEC may not pursue civil penalties against Fraser for claims that accrued prior to March 5, 2004. The Court makes no determination about whether any particular claim accrued before that date.

judicial notice of it. Watson raises no objection to the Court doing so, and he does not dispute the agreement's authenticity. (*See* Dkt. # 52.) Therefore, the limitations period for Watson excludes the 314 days between February 22, 2008, and December 31, 2008. The SEC is thus unable to pursue civil penalties for claims against Watson that accrued prior to April 27, 2003.[13]

## CONCLUSION

As explained above:

**IT IS HEREBY ORDERED** that the Motions to Dismiss of Defendant Martin G. Fraser (Dkt. # 30) and Defendant Don W. Watson (Dkt. # 31) are **GRANTED IN PART** and **DENIED IN PART**, as spelled out in this Order. The claims against Defendants Fraser and Watson in the First Amended Complaint are therefore dismissed with leave to replead.

**IT IS FURTHER ORDERED** that the SEC shall file a Second Amended Complaint that complies with the applicable rules and the requirements of this Order by **5:00 p.m.** on **September 11, 2009**.

DATED this 11th day of August, 2009.

_____
G. Murray Snow
United States District Judge

---

[13]Again, the Court makes no determination of whether any claims accrued before that date because the parties have not argued the point.